## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SARA DUNN, CHERIE HART, AND BRITTANY WILLIAMS *on behalf of themselves and all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>MIGUEL CARDONA, *in his official capacity as Secretary of the United States Department of Education*, 400 Maryland Avenue Southwest Washington, DC 20202,<br><br>AND<br><br>THE UNITED STATES DEPARTMENT OF EDUCATION, 400 Maryland Avenue Southwest Washington, DC 20202<br><br>*Defendants*. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## **INTRODUCTION**

1.      Nearly six years ago, the Office of the Massachusetts Attorney General ("AGO") filed an application with the United States Department of Education ("Department") seeking federal student loan discharges on behalf of students formerly enrolled in the Medical Assistant and Medical Billing and Coding programs at for-profit Kaplan Career Institute in Boston, Massachusetts ("Kaplan"). Inexplicably, the Department has ignored this application.

2.      The application ("Kaplan Group Application") was submitted as a "borrower defense to repayment," pursuant to provisions in the federal Higher Education Act ("HEA") and

1

the Department's implementing regulations, as well as terms in federal student loan Master

Promissory Notes, that provide for federal student loan discharges based on institutional

misconduct.

3.     The misconduct described in the Kaplan Group Application was uncovered in the

AGO's extensive investigation into Kaplan's recruitment and educational practices. The

Application also followed the AGO's entry of an Assurance of Discontinuance pursuant to

M.G.L. c. 93A, § 5 ("Kaplan AOD"). *See* <u>Exhibit A</u>. The Kaplan AOD describes substantial

evidence of misconduct, including unfair and deceptive practices by Kaplan between 2009 and

2012 "designed to induce enrollment of students at the [s]chool." *Id.* ¶ 3. Upon information and

belief, the AGO submitted detailed evidence to the Department in support of the Kaplan Group

Application, including descriptions of violations of Massachusetts law committed by Kaplan.

4.     As of today, nearly *six years* after the AGO's submission, the Department has not

issued a decision on the Kaplan Group Application.

5.     This six-year failure is unconscionable, given the detailed evidence of misconduct

that the AGO provided to the Department. This six-year failure is also *illegal* given the holdings

of numerous cases within this District *requiring* the agency to adjudicate applications submitted

by the AGO on behalf of aggrieved borrowers. As this court stated nearly two years ago, "the

[Department] [is] not free to simply ignore such an application." *Vara v. DeVos*, No. CV 19-

12175-LTS, 2020 WL 3489679, at *26 (D. Mass. June 25, 2020), *appeal dismissed sub nom.*

*Vara v. Cardona*, No. 20-1832, 2021 WL 4057798 (1st Cir. July 21, 2021). With respect to the

Kaplan Group Application, the Department has done precisely that.

6.     Named Plaintiffs, on behalf of themselves and all others covered by the Kaplan

Group Application, have filed this action to seek: (1) a declaration that the Department's six-year

delay constitutes "agency action unlawfully withheld or unreasonably delayed" pursuant to 5

U.S.C. § 706(1); (2) a declaration that the Department's constructive denial of the Kaplan Group

Application is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A); (3) an order

vacating the constructive denial, or, in the alternative, declaring that the Department's failure to

issue a reasoned decision on the merits is unlawful; and (4) an order compelling the agency to

issue a reasoned decision on the merits of the Kaplan Group Application within 60 days of the

Court's Order.

## JURISDICTION AND VENUE

7.     This action arises under the Administrative Procedure Act (APA), 5 U.S.C. §§

701-706, and the HEA, 20 U.S.C. § 1001, *et seq.* This Court has jurisdiction over this case as it

arises under federal law. 28 U.S.C. § 1331.

8.     Venue is proper in this judicial district because a substantial part of the events or

omissions giving rise to the claims occurred here, 28 U.S.C. § 1391(e)(1)(B), and Named

Plaintiffs Sara Dunn and Brittany Williams are residents of this judicial district. *Id*. §

1391(e)(1)(C).

9.     This Court is authorized to grant the relief requested in this case pursuant to the

APA, 5 U.S.C. § 706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the Higher

Education Act, 20 U.S.C. § 1082, and Federal Rule of Civil Procedure 23.

## PARTIES

10.     Plaintiff Sara Dunn is a resident of Weymouth, Massachusetts. She took out

federal student loans to attend Kaplan's Medical Assistant program from October 2009 to July

2010. Ms. Dunn continues to have an obligation to repay the federal student loans that she took

out to attend Kaplan. To date, Ms. Dunn has not filed her own borrower defense application and

the Department has not rendered a reasoned decision on the Kaplan Group Application asserted on Ms. Dunn's behalf.

11.     Plaintiff Cherie Hart is a resident of Pawtucket, Rhode Island. She took out federal student loans to attend Kaplan's Medical Billing & Coding program from July 2009 to April 2010. Ms. Hart continues to have an obligation to repay the federal student loans that she took out to attend Kaplan. To date, Ms. Hart has not filed her own borrower defense application, and the Department has not rendered a reasoned decision on the Kaplan Group Application asserted on her behalf.

12.     Plaintiff Brittany Williams is a resident of North Billerica, Massachusetts. She took out federal student loans to attend Kaplan's Medical Assistant program from 2011 to 2012. Ms. Williams continues to have an obligation to repay the federal student loans that she took out to attend Kaplan. To date, Ms. Williams has not filed her own borrower defense application, and the Department has not rendered a reasoned decision on the Kaplan Group Application asserted on her behalf.

13.     Defendant Miguel Cardona is the Secretary of Education (the "Secretary"), and is charged by statute with the supervision and management of all decisions and actions of the United States Department of Education. The Secretary oversees and is responsible for federal student loan programs. *See* 20 U.S.C. § 1070(b). Plaintiffs sue Secretary Cardona in his official capacity.

14.     Defendant United States Department of Education is an "agency" of the United States, within the meaning of the APA, 5 U.S.C. § 701(b)(1). It is responsible for overseeing and implementing rules for the federal student aid program.

## STATEMENT OF FACTS

### *Statutory and Regulatory Framework*

15.     The loans at issue in this case were issued under Title IV of the Higher Education

Act of 1965 ("HEA"), 20 U.S.C. §§ 1070-1099, which provides the statutory authorization for

federal student loans, including the Federal Family Education Loan ("FFEL") and Direct Loan

programs.

16.     Under the FFEL program, private lenders issued student loans, which were then

insured by guaranty agencies and in turn reinsured by the Department. *Id.* § 1078(b)-(c). Since

July 1, 2010, no new loans can be made under the FFEL program.

17.     Under the Direct Loan program, the federal government directly issues student

loans to eligible borrowers for use at "participating institutions of higher education" as approved

by the Department. *See* 20 U.S.C. § 1087a.

18.     Direct Loans and FFEL loans have the same terms, conditions, and benefits. 20

U.S.C. § 1087e(a)(1).

19.     Plaintiffs Dunn, Hart, and Williams each borrowed Direct Loans to pay for their

attendance at Kaplan.

20.     On information and belief, other borrowers included in the Kaplan Group

Application borrowed FFEL loans to pay for their own or their child's attendance at Kaplan.

### *Borrower Defense*

21.     "Borrower defense to repayment," or "borrower defense" for short, refers to an

assertion that a federal student loan is void or unenforceable due to misconduct by the

borrower's school.

22.     Beginning on January 1, 1994, the Department issued a Common Application/Promissory Note for all FFEL Program loans, providing that the borrower is entitled to assert as a defense to repayment of the loan, "all claims and defenses that the borrower could assert against the school." This provision was later incorporated into the Department's FFEL regulations. 72 Fed. Reg. 61,960 (Nov. 1, 2007) (adopting 34 C.F.R. § 682.209(g)).

23.     In 1993, Congress altered the terms and conditions of Direct Loans to allow for student loan borrowers to seek cancellation of their loans on the basis of school misconduct. 103 Pub. L. No. 66, 107 Stat. 312. The statute directs that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part[.]" 20 U.S.C. § 1087e(h).

24.     Pursuant to this directive, the Secretary promulgated a regulation that permitted a Direct Loan borrower to assert, as a defense to repayment, "any act or omission of the school attended by the student that . . . would give rise to a cause of action against the school *under applicable state law*." 34 C.F.R. § 685.206(c)(1) (emphasis added). This regulation became effective July 1, 1995 and applies to loans taken out prior to July 1, 2017. *Id.*; *see* 34 C.F.R. § 685.222(a).

25.     Given that the Named Plaintiffs and each member of the proposed class took out federal student loans to attend Kaplan no later than 2012, when the school stopped operating in Massachusetts, and that the AGO submitted the Kaplan Group Application in May 2016—all well before July 1, 2017—the state law standard under the 1995 borrower defense regulation applies to the Kaplan Group Application.

26.     The law requires, and it has been the Department's practice, to place federal student loans in forbearance and cease collection activities upon receipt of a borrower defense

application. At times, it has also been the Department's practice (and was later incorporated into the Department's regulations) to cancel interest that accrues on a federal student loan after a certain period of time while that loan is in forbearance pending resolution of a borrower defense application. The borrowers on whose behalf the Kaplan Group Application was asserted did not receive the benefit of these practices.

***The Secretary is Required to Adjudicate Group Borrower Defense Applications Submitted by State Attorneys General***

27.     The Secretary is required to issue reasoned decisions in response to borrower defense applications submitted by state attorneys general. *See, e.g.*, *Vara,* 2020 WL 3489679, at *6 ("[T]he texts of the HEA and the 1995 borrower defense regulation, as well as [the Department's] contemporaneous interpretations, contracts, and adjudicatory practices, demonstrate that the agency must adjudicate affirmative applications for borrower defense relief," and that the Department had a "duty to render reasoned, non-arbitrary decisions as to each borrower who took out loans on behalf of students listed in the [application].'""); *Williams v. DeVos*, No. 16-cv-11949-LTS, 2018 WL 5281741, at *15 (D. Mass. Oct. 24, 2018) (requiring the Department to determine the validity of a group borrower defense application brought by the AGO as to two Corinthian College borrowers).

28.     The Department is "not free to simply ignore such an application." *Vara*, 2020 WL 3489679, at *26.

***The Massachusetts AGO Investigates and Takes Action Against Kaplan***

29.     Following an investigation, the AGO concluded that, from 2009 to 2012, Kaplan violated state consumer protection laws by engaging in unfair or deceptive practices designed to induce students, including Named Plaintiffs, to enroll. *See* Exhibit A (Kaplan AOD) ¶ 3.

30.     These illegal practices included: "unfair and harassing sales tactics and false and misleading representations in its oral recruitment statements and in written marketing and recruitment materials to consumers and prospective students concerning its educational program and employment." *Id.*

31.     Further, in certain instances, "Kaplan's website and admissions representatives reported placement rates for its Medical Billing and Coding and its Medical Assistant programs above 70% when in fact the actual placement rates were materially lower." *Id.*

32.     The AGO also concluded that "through oral recruitment statements and written materials, Kaplan promised to provide students assistance in finding jobs in their fields of study," but that "students reported that the job listings provided by Kaplan were from publicly available resources and that Kaplan did not provide any special services or programs to assist students and graduates in their job search." *Id.*

33.     As a result, "Kaplan unfairly or deceptively induced students to enroll in the Medical Billing & Coding and Medical Assistant programs at the Kenmore campus." *Id.*

34.     In 2015, the AGO settled with Kaplan. Under the Kaplan AOD, the school agreed to pay $1,375,000.

35.     Most of the students who enrolled because of Kaplan's misconduct were not fully compensated by the settlement.

***The Massachusetts AGO Files the Kaplan Group Application, Which the Department Then Ignores for Nearly Six Years***

36.     On May 6, 2016, the AGO submitted a group borrower defense application on behalf of all Massachusetts Kaplan student loan borrowers who were enrolled in the Medical Assistant program.

37.     On May 31, 2016, the AGO submitted a supplement to the group borrower defense application, adding claims on behalf of all Massachusetts Kaplan student loan borrowers who were enrolled in the Medical Billing and Coding program.

38.     On information and belief, the AGO described and/or listed the student loan borrowers in the Kaplan Group Application in a manner sufficient for the Department to identify such borrowers.

39.     The Department has confirmed receipt of the Kaplan Group Application on multiple occasions. For example, in May 2019, the Department provided to Congress a list of pending borrower defense applications submitted by state attorneys general, which included the Kaplan Group Application. *See* Exhibit B, Letter from Sen. Richard J. Durbin, *et al.* to Betsy DeVos, Sec'y of Educ., U.S. Dep't of Educ., at 1 n.3, 5–6 (June 18, 2019).

40.     In August 2019, following a request by numerous members of the United States Senate to provide an "update on the status of each of the group discharge applications," the Department confirmed that the Kaplan Group Application was under "review." *See* Exhibit C, Response from Diane Auer Jones, Principal Deputy Under Sec'y, U.S. Dep't of Educ., to Sen. Richard J. Durbin (Aug. 6, 2019).

41.     To date, nearly *six years* after the Kaplan Group Application was filed, the Department has not issued a final determination on that application.

42.     In contrast, it took the Department just *six months* to adjudicate a similar group application, related to a different school, submitted by the AGO in 2016. *See Vara*, 2020 WL 3489679, at *5 (describing application on behalf of students from American Career Institute).

*Harm to Named Plaintiffs and the Putative Class*

43.     The Department's illegal delay in adjudicating the Kaplan Group Application has caused material harm to Named Plaintiffs and the proposed class, who have been burdened for at least a decade by student loans that they were fraudulently induced to take out.

44.     If the Department had treated the Kaplan Group Application as a valid borrower defense application (which it was), Named Plaintiffs and the proposed class would have received the option to put their loans into forbearance pending the Department's decision regarding the application.

45.     If the Department had not unlawfully withheld or unreasonably delayed action on the Kaplan Group Application, Named Plaintiffs and the proposed class also would have received a reasoned response to that application; even if it were an adverse decision, they would have had the opportunity to appeal that final decision administratively within the Department and/or in federal court.

46.     Because of the Department's failure to issue a decision on the Kaplan Group Application and/or constructive denial of the Kaplan Group Application, Named Plaintiffs continue to have fraudulently induced student loans appear on their credit reports, with negative implications.

47.     Because of the Department's failure to issue a decision on the Kaplan Group Application and/or constructive denial of the Kaplan Group Application, Named Plaintiffs have a current obligation to repay their federal student loans. That obligation requires them to resume payments on, or shortly after, August 31, 2022, when the COVID-19 related student loan repayment "pause" expires.

48.     Because of the Department's failure to issue a decision on the Kaplan Group
Application and/or constructive denial of the Kaplan Group Application, Named Plaintiffs have
experienced emotional distress, psychological harms, and anxiety.

49.     All Named Plaintiffs are further harmed because, as soon as the payment pause is
lifted, interest will once again accrue on their Direct unsubsidized loans used to attend Kaplan.

*Sara Dunn*

50.     Sara Dunn enrolled in the Medical Assistant program at Kaplan in October 2009
and graduated in July 2010. Prior to enrolling, Ms. Dunn worked in a doctor's office answering
phones; she thought working as a medical assistant would allow her to help people more directly.

51.     After seeing advertisements for Kaplan, Ms. Dunn was drawn to its Medical
Assistant program because of the campus location and lofty job placement promises.

52.     Before she enrolled, a Kaplan admissions representative assured her that nearly all
Kaplan graduates got jobs, and that the school would make sure she got a job right after
graduation.

53.     Ms. Dunn took out over $9,000 in federal student loans to attend Kaplan. She also
received a federal Pell Grant.

54.     After Ms. Dunn completed her course of study and internship, she was unable to
find a job. When she reached out to Kaplan for help, she did not receive the job placement
services she was promised.

55.     Ms. Dunn has never been able to get a job in the medical assisting field. After
Kaplan, she eventually found work as a sales representative for a company that made equipment
labels and nuts and bolts. After that, she has had multiple temporary jobs, including as a

receptionist for an urgent care facility and for a non-profit that provides services to people experiencing homelessness. Ms. Dunn has been unemployed since early April 2022.

56.     Ms. Dunn still owes over $8,000 on her federal student loans used to finance her attendance at Kaplan.

57.     Ms. Dunn has not received any notification from the Department about a decision regarding the Kaplan Group Application or discharge of her federal student loans taken out to attend Kaplan.

58.     Since graduating from Kaplan, Ms. Dunn has not had enough income to start making her monthly payments.

59.     Although she currently does not have to make payments on her loans due to the COVID-related pause on student loan repayment, the pause is set to expire on August 31, 2022.

***Cherie Hart***

60.     Cherie Hart enrolled in Kaplan's Medical Billing & Coding program in July 2009 and graduated in April 2010.

61.     When researching billing and coding programs, Ms. Hart saw online advertisements for Kaplan and was drawn to its program because of its short length and lofty job placement promises.

62.     Before she enrolled, a Kaplan admissions representative left her with the impression that all Kaplan students received jobs upon graduation.

63.     Ms. Hart took out over $9,000 in federal student loans to attend Kaplan. She also received a federal Pell Grant.

64.     Kaplan's admissions representative also told Ms. Hart that she would be placed in an internship where she should gain relevant experience in billing and coding. Instead, she was

placed at Boston Medical Center as an intern doing administrative work and client intake, not billing and coding.

65.     After graduating, Ms. Hart sought help from Kaplan to find a billing and coding job, but she received no help from the school.

66.     Ms. Hart searched for billing and coding jobs for one year after graduating from Kaplan, while doing part-time work such as babysitting and serving as a TaskRabbit. During this time, she struggled to pay her bills and make ends meet.

67.     Ms. Hart has never been able to obtain employment in the billing and coding field, which was the entire reason she attended Kaplan.

68.     Ms. Hart has not received any notification from the Department about a decision regarding the Kaplan Group Application or discharge of her federal student loans taken out to attend Kaplan.

69.     Ms. Hart still owes over $7,000 on her federal student loans used to finance her attendance at Kaplan.

70.     For most of the time since graduating from Kaplan, Ms. Hart has not been able to make her monthly payments. The debt has negatively impacted her finances and quality of life.

71.     Although she currently does not have to make payments on her loans due to the COVID-related pause on student loan repayment, the pause is set to expire on August 31, 2022.

***Brittany Williams***

72.     Brittany Williams decided to enroll in the Medical Assistant program at Kaplan in 2011 to follow her childhood dream of working in healthcare and helping others.

73.     She chose Kaplan because it offered an internship program, advertised extremely high job placement rates, and assured her that she would obtain a medical assisting job after

graduation.

74.    Ms. Williams took out $9,500 in federal student loans to attend Kaplan, and, with the help of her mother, also paid tuition through out-of-pocket payments.

75.    Ms. Williams received good grades and followed all the requirements to graduate, including completing an internship which she was told would provide the clinical skills necessary to quickly obtain a full-time medical assistant job.

76.    Instead of getting placed in a medical assisting internship, Ms. Williams was placed in a chiropractor's office manning the front desk and organizing files.

77.    After graduating, Ms. Williams sought help from Kaplan to find a medical assisting job, but school representatives told her there was nothing they could do. Ultimately, the school did not place her in a medical assistant job. Ms. Williams never worked as a medical assistant.

78.    Ms. Williams applied for numerous medical assistant positions on her own but was told by employers that she did not have enough experience and did not meet the credentials because she lacked clinical hours. Ms. Williams ended up continuing the jobs she held while in school, at a grocery store and a medical records office. She currently works at the grocery store.

79.    Ms. Williams still owes over $8,000 on her federal student loans used to finance her attendance at Kaplan.

80.    Ms. Williams has not received any notification from the Department about a decision regarding the Kaplan Group Application or discharge of her federal student loans taken out to attend Kaplan.

81.     In the ten years since she graduated, Ms. Williams has not been able to afford to make payments on her student loans. She applied for a forbearance in 2013 and defaulted in 2015. The debt has negatively impacted her credit and ability to pay for daily essentials.

82.     Although she currently does not have to make payments on her loans due to the COVID-related pause on student loan repayment, the pause is set to expire on August 31, 2022.

## CLASS ACTION ALLEGATIONS

83.     Named Plaintiffs seek to represent a class of all individuals who:

> (i) borrowed a federal student loan pursuant to Title IV of the Higher Education Act in connection with their own or their child's enrollment at Kaplan Career Institute; (ii) are included in the Kaplan Group Application; (iii) have not yet received a favorable decision as to a borrower defense application pertaining to a loan taken out to attend Kaplan; and (iv) have not otherwise had all of their Kaplan Career Institute federal student loans forgiven or cancelled with a refund of sums already paid.

84.     All borrowers identified in the Kaplan Group Application took out federal student loans to pay for their (or for a federal Parent PLUS borrower, their child's) attendance at Kaplan.

85.     The proposed class satisfies the requirements of Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

86.     The class is so numerous that joinder of all members is impracticable. On information and belief, roughly one hundred students were enrolled in Kaplan's Medical Assisting and Medical Billing and Coding programs between 2009 and 2012. On information and belief, all or nearly all members of the proposed class borrowed federal student loans to finance their attendance, and/or had parents borrow federal student loans on their behalf. On information and belief, a significant portion of loans incurred by members of the proposed class have not been repaid in whole or otherwise completely discharged.

87.     The exact number of class members can be readily determined using the Department's records.

88.     The nature of relief sought, as well as questions of fact and law, are common to all members of the class.

89.     The Department's failure to issue a reasoned decision on the Kaplan Group Application is identical for the entire class, all of whom are covered by the application. The Department's challenged actions therefore apply generally to the class, making declaratory relief regarding those actions appropriate for the class as a whole.

90.     The common questions of law and fact also predominate over any questions affecting individual members. The common questions of law and fact include: (i) whether the Department's failure to issue a reasoned decision on the Kaplan Group Application after six years constitutes unreasonable delay under the APA, 5 U.S.C. § 706(1); and (ii) whether the Department's failure to issue a reasoned decision on the Kaplan Group Application after six years constitutes an arbitrary and capricious constructive denial, in violation of 5 U.S.C. § 706(2)(A).

91.     Named Plaintiffs' claims are typical of the claims of the proposed class. Ms. Dunn, Ms. Hart, and Ms. Williams, like all members of the proposed class, are included in the AGO's Kaplan Group Application. Named Plaintiffs' claims also arise out of the same course of conduct and rely on the same legal theories as the claims of the proposed class.

92.     Named Plaintiffs are capable of and committed to fairly and adequately protecting the interests of the class and have no conflicts with other class members.

93.     Named Plaintiffs are represented by counsel experienced in higher education law, administrative law, the borrower defense to repayment regulations, and class action litigation.

94.     A class action is superior for the fair and efficient adjudication of this matter. The Department has acted in the same unlawful manner with respect to all class members, each of whom are damaged by reason of the Department's failure to adjudicate the Kaplan Group Application. A legal ruling concerning the unlawfulness of the Department's actions under the APA would vindicate the rights of every class member. Finally, a class action would serve the economies of time, effort, and expense while preventing inconsistent results.

95.     A class is appropriate under Federal Rule of Civil Procedure 23(b)(2) because the Department's failure to issue a reasoned decision after six years applies generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

## CAUSES OF ACTION

### COUNT I
### Violation of the APA, 5 U.S.C. § 706(1) for Failure to Issue a Reasoned Decision on the Kaplan Group Application

96.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

97.     Defendants have an obligation to adjudicate all borrower defense claims submitted by or on behalf of federal student loan borrowers.

98.     The Kaplan Group Application is a valid borrower defense application on behalf of Named Plaintiffs and the proposed class.

99.     Defendants have failed to issue a decision on the Kaplan Group Application, even though the valid application has been pending for nearly six years.

100.     Defendants' failure to adjudicate the Kaplan Group Application constitutes an agency action unlawfully withheld and unreasonably delayed, within the meaning of 5 U.S.C. § 706(1).

101.     Under the APA, a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

102.     A "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review." 5 U.S.C. § 702.

103.     Defendants' inaction and delay has harmed Named Plaintiffs and members of the proposed class.

**COUNT II**
**Violation of the APA, 5 U.S.C. § 706(2) for Constructive Denial of the Kaplan Group Application**

104.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

105.     Defendants have violated the APA, 5 U.S.C. § 706(2), by constructively denying the Kaplan Group Application without providing any reasons for its action.

106.     Pursuant to the APA, a court "shall [] hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

107.     "Agency action" includes the "failure to act." 5 U.S.C. § 551(13).

108.     The Kaplan Group Application is a valid borrower defense application on behalf of Named Plaintiffs and the proposed class.

109.    Defendants' failure to issue a reasoned decision on the Kaplan Group Application amounts to constructive denial of the Kaplan Group Application, because the effect of the Defendants' inaction is the same as the effect of denying relief. Named Plaintiffs and members of the class remain subject to collection on the loans that are the subject of the Kaplan Group Application. *See Vara*, 2020 WL 3489679, at *29.

110.    Defendants have not provided any explanation for why they have constructively denied the Kaplan Group Application, which they are required to do. *See Vara*, 2020 WL 3489679, at *30; *see also* 5 U.S.C. § 555(e) ("Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial.").

111.    Defendants' failure to provide any reasoning to explain why they have constructively denied the Kaplan Group Application is therefore arbitrary, capricious, and not in accordance with law under 5 U.S.C. § 706(2)(A). *See Vara*, 2020 WL 3489679, at *30 (holding that the Department's "failure to render a reasoned decision justifying its denial of the [Massachusetts AG's group borrower defense] Application is arbitrary, capricious, and contrary to law").

112.    Defendants' constructive denial of the Kaplan Group Application has harmed Named Plaintiffs and members of the proposed class.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor and

grant the following relief:

A.      Certify the class as defined in paragraph 83, pursuant to Federal Rule of Civil

Procedure 23;

B.      Declare that Defendants' delay in adjudicating the Kaplan Group Application

constitutes "agency action unlawfully withheld or unreasonably delayed";

C.      Declare that Defendants' constructive denial of the Kaplan Group Application is

arbitrary and capricious, and vacate the constructive denial on that basis, or, in the alternative,

declare that Defendants' failure to issue a reasoned decision on the merits is unlawful;

D.      Compel Defendants to issue a reasoned decision on the merits of the Kaplan

Group Application within 60 days of the Court's Order;

E.      Award reasonable costs and attorneys' fees as authorized by law; and

F.      Grant such further relief as may be just and proper.

Respectfully submitted,

*/s/ Olivia D. Webster*
Olivia D. Webster (CO Bar No. 35867)*
Daniel A. Zibel (D.C. Bar No. 491377)*
Alexander S. Elson (D.C. Bar No. 1602459)*
NATIONAL STUDENT LEGAL DEFENSE
NETWORK
1015 15th Street NW, Suite 600
Washington, DC 20005
(202) 734-7495
libby@defendstudents.org
dan@defendstudents.org
alex@defendstudents.org

*Motion for admission *pro hac
vice* forthcoming

*/s/ Rebecca C. Ellis*
Rebecca C. Ellis (B.B.O. #685729)
Michael N. Turi (B.B.O. #706205)**
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 390-3003
rellis@law.harvard.edu
mturi@law.harvard.edu

**D. Mass. bar admission pending

ADDITIONAL COUNSEL LISTED ON
SUBSEQUENT PAGE

*/s/ Stuart T. Rossman*
Stuart T. Rossman (B.B.O. #430640)
Kyra A. Taylor (B.B.O. #704332)***
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square
Boston, MA 02110
Tel: (617) 542-8010
sgrossman@nclc.org
ktaylor@nclc.org

***D. Mass. bar admission forthcoming


Dated: April 25, 2022